[926 NE2d 1212, 900 NYS2d 708]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE TOLENTINO, Also Known as JOSE R. TOLENTINO, Appellant.

Argued February 10, 2010; decided March 30, 2010

### POINTS OF COUNSEL

*Legal Aid Society,* New York City (*Kristina Schwarz* and *Steven Banks* of counsel), for appellant. Department of Motor Vehicles records obtained as the direct, immediate result of an unlawful traffic stop constitute "fruit of the poisonous tree" and are subject to suppression under the exclusionary rule. (*Wong Sun v United States,* 371 US 471; *Silverthorne Lumber Co. v United States,* 251 US 385; *Sibron v New York,* 392 US 40; *Davis v Mississippi,* 394 US 721; *United States v Giordano,* 416 US 505; *Dunaway v New York,* 442 US 200; *People v Gethers,* 86 NY2d 159; *People v May,* 81 NY2d 725; *People v Rossi,* 80 NY2d 952; *Nardone v United States,* 308 US 338.)

*Cyrus R. Vance, Jr., District Attorney,* New York City (*Allen J. Vickey* and *Alan Gadlin* of counsel), for respondent. The lower courts correctly held that defendant's Department of Motor Vehicles records were not subject to suppression. (*People v Smith,* 170 Misc 2d 486; *Wong Sun v United States,* 371 US 471; *People v Jones,* 2 NY3d 235; *People v Rogers,* 52 NY2d 527; *Hudson v Michigan,* 547 US 586; *People v Arnau,* 58 NY2d 27; *INS v Lopez-Mendoza,* 468 US 1032; *Navarro-Chalan v Ashcroft,* 359 F3d 19; *United States v Bowley,* 435 F3d 426.)

### OPINION OF THE COURT

READ, J.

At about 7:40 P.M. on New Year's Day in 2005, defendant Jose Tolentino was driving a car in the vicinity of West 181st Street and Broadway in New York City. The police stopped him for playing music too loudly, learned his name, and ran a computer check of Department of Motor Vehicles (DMV) files to look up his driving record. When this check revealed that defendant's license was suspended with at least 10 suspensions imposed on at least 10 different dates, he was arrested and charged with one count of aggravated unlicensed operation of a motor vehicle in the first degree.

As part of an omnibus motion, defendant sought to suppress his driving record and any statements made after arrest; alternatively, he asked Supreme Court to hold a *Mapp/Dunaway* and/or a *Huntley/Dunaway* hearing. Defendant alleged that the police unlawfully stopped his car and illegally obtained his driving record from DMV. Specifically, he contended that his driving record was a suppressible fruit of a Fourth Amendment violation because "[t]he steps required to obtain a DMV records check are the stop of the vehicle and the elicitation of the driver's name or the driver's license number." As a result, defendant argued, "[b]ut for defendant's unlawful seizure by the police, his DMV records would not have been obtained in this case, and they are therefore the fruit of the police illegality." The People opposed the motion, first on the ground that the stop was legal; second, they took the position that, even if the stop were, in fact, illegal, a defendant's identity is never a suppressible fruit, and, in any event, a public agency possessed the records.

On July 12, 2005, Supreme Court granted defendant's motion for a *Huntley/Dunaway* hearing, but denied his request for a *Mapp* hearing. The judge held that "[a]n individual does not possess a legitimate expectation of privacy in files maintained by the [DMV] and such records do not constitute evidence which is subject to suppression under a *fruit of the poisonous tree* analysis." On August 3, 2005, defendant pleaded guilty to the crime charged in exchange for five years' probation; on September 28, 2005, Supreme Court sentenced him as promised.

Defendant appealed, claiming that because his driving record was suppressible, he was entitled to a remand for a hearing. The Appellate Division disagreed and unanimously affirmed (59 AD3d 298 [1st Dept 2009]). The court relied on the United States Supreme Court's decision in *INS v Lopez-Mendoza* (468 US 1032, 1039 [1984]) for the proposition that the identity of a defendant is never suppressible as the fruit of an unlawful arrest. And because defendant's identity led to the discovery of his DMV records, those records were likewise not suppressible. Finally, the Appellate Division noted that the records had been compiled independently of defendant's arrest. A Judge of this Court granted defendant permission to appeal (12 NY3d 860 [2009]), and we now affirm.

In *INS v Lopez-Mendoza* (468 US at 1039) the Supreme Court held that the " 'body' or identity of a defendant . . . in a criminal or civil proceeding is never itself suppressible as a fruit of

an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.'' A contrary holding would ''permit[ ] a defendant to hide who he is [and] would undermine the administration of the criminal justice system'' (*United States v Farias-Gonzalez*, 556 F3d 1181, 1187 [11th Cir 2009]). Accordingly, defendant does not argue that his name or identity would be subject to suppression as a fruit of the allegedly unlawful stop. Rather, he claims that the preexisting DMV records are subject to suppression because without the alleged illegality, the police would not have learned his name and would not have been able to access these records.

Federal circuit courts addressing this issue in the context of those suspected of illegally residing in the country have held that, when the police stop or seize a defendant, learn his or her name, and use that name to check preexisting government immigration files, the records are not subject to suppression (*United States v Farias-Gonzalez*, 556 F3d at 1189; *United States v Bowley*, 435 F3d 426, 430-431 [3d Cir 2006]; *United States v Roque-Villanueva*, 175 F3d 345, 346 [5th Cir 1999]). For example, in *Hoonsilapa v Immigration & Naturalization Serv.* (575 F2d 735, 737 [9th Cir 1978]), the government sought to deport an alien after learning from his INS administrative file that he was in the country illegally. The alien moved to suppress the file, arguing that it was the ''fruit'' of an illegal search and arrest (*id.*). The Ninth Circuit rejected the argument, noting that the alien's INS file was already in the possession of the government at the time of the purportedly illegal arrest and search, and that the government's ''decision to search the INS files was only the 'product' of the discovery of [the alien's] identity during the illegal arrest and search'' (*id.* at 738). The court emphasized that ''the mere fact that Fourth Amendment illegality directs attention to a particular suspect does not require exclusion of evidence subsequently unearthed from independent sources'' (*id.*).

The facts here are analogous. The officers learned defendant's identity when they stopped his car; that knowledge permitted the police to run a computer check that led to the retrieval of defendant's DMV records. Under the rationale of *Lopez-Mendoza* and the above federal circuit court decisions, defendant's DMV records were therefore not suppressible as the fruit of the purportedly illegal stop. In short, ''there is no sanction . . . when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or

other independent evidence" (*United States v Guzman-Bruno*, 27 F3d 420, 422 [9th Cir 1994] [citation and internal quotation marks omitted]).

While not forming an independent basis for this outcome, the result is further supported by the nature of the records at issue, which were public records already in the possession of authorities (*United States v Crews*, 445 US 463, 475-477 and 475 n 22 [1980 plurality op] ["(t)he exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality"]; *see also Matter of Jason W.*, 272 AD2d 214 [1st Dept 2000]; *People v Bargas*, 101 AD2d 751, 752 [1st Dept 1984]).

In *People v Pleasant* (54 NY2d 972 [1981]), we applied similar principles to deny exclusion of independently-compiled information in the possession of a public agency. There, the defendant was illegally arrested in Suffolk County for weapon possession, at which time the police discovered that one of the guns recovered during the unlawful arrest had been used in a robbery in Bronx County. Suffolk County authorities conveyed this information, along with the defendant's name and date of birth, to the Bronx police. The Bronx police then retrieved the defendant's photograph from the Bureau of Criminal Identification and showed it to the robbery victims, who positively identified the defendant from a photographic array. After the defendant was arrested on a warrant, one of the robbery victims identified him in a lineup.

We rejected the defendant's claim that the photographic identifications should be suppressed as the fruit of the illegal arrest, holding that "only defendant's identity was obtained as a result of the unlawful seizure" and the photographic identifications "were not an exploitation of the antecedent illegality, as defendant's photograph was obtained from a source independent of the unlawful arrest, and such identifications proceeded from the witnesses' independent recollections" (*Pleasant* at 974 and n [citation omitted]). Similarly, the DMV records here were obtained by the police from a source independent of the claimed illegal stop.

As the *Farias-Gonzalez* court pointed out, the policy rationale of the exclusionary rule would not be served by its application to identity-related evidence. The social costs of excluding such evidence are great: courts and the government are entitled to

know who defendants are, since permitting defendants to hide their identity would undermine the administration of the criminal justice system and essentially allow suppression of the court's jurisdiction. On the other side of the equation, there are few deterrence benefits. The Constitution does not prohibit the government from requiring a person to identify himself to a police officer. In addition,

> "even if a defendant in a criminal prosecution successfully suppresses all evidence of his identity and the charges are dropped, the Government can collect new, admissible evidence of identity and reindict him. This is so because identity-related evidence is not unique evidence that, once suppressed, cannot be obtained by other means" (*Farias-Gonzalez*, 556 F3d at 1188-1189 [citation omitted]).

As a result, "[t]he application of the exclusionary rule to identity-related evidence will have a minimal deterrence benefit, as its true effect will often be merely to postpone a criminal prosecution" (*id.* at 1189).

Nor do we believe that "[t]oday's opinion [will] give[ ] law enforcement an incentive to illegally stop, detain, and search anyone for the sole purpose of discovering the person's identity and determining if it matches any government records accessible by the police" (dissenting op at 390). Police are already deterred from conducting illegal car stops because evidence recovered in the course of an illegal stop remains subject to the exclusionary rule.

While the Supreme Court has held that fingerprint evidence— evidence the dissent describes as "paradigmatic identity evidence" (dissenting op at 389)—may be subject to the exclusionary rule (*Davis v Mississippi*, 394 US 721, 724 [1969]), *Davis*, as well as *Hayes v Florida* (470 US 811, 815 [1985]), is distinguishable from this case in two ways. First, the defendants in those cases were illegally stopped for the purpose of obtaining evidence—fingerprints—that would connect the defendants to crimes under investigation. The "identity evidence" was not preexisting. Second, the fingerprints were used, not to establish the identities of the individuals apprehended by the police and subject to the jurisdiction of the court, but to connect those individuals' fingerprints to latent prints recovered from the crime scene. The evidence established defendants' "identities" as the perpetrators, but not their "identities" in the sense relevant here. Our decision today would not alter the outcome of

those cases. We merely hold that a defendant may not invoke the fruit-of-the-poisonous-tree doctrine when the only link between improper police activity and the disputed evidence is that the police learned the defendant's name.

Accordingly, the order of the Appellate Division should be affirmed.

CIPARICK, J. (dissenting). Because I believe that Department of Motor Vehicles (DMV) records are subject to suppression if obtained by the police through the exploitation of a Fourth Amendment violation, namely an unlawful traffic stop, I respectfully dissent.

The majority has set forth a new rule, that regardless of police conduct, DMV records obtained through a police stop and inquiry of the driver are not subject to the exclusionary rule when the only link between the police conduct and the evidence is that the police learned a defendant's name (*see* majority op at 388). Further, the majority believes that DMV records are not subject to suppression since they are government records compiled independently of defendant's arrest. We disagree on both counts.

It has long been established that evidence derived from a Fourth Amendment violation must be suppressed as "fruit of the poisonous tree" if law enforcement " 'exploited or benefited from its illegal conduct' such that 'there is a connection between the violation of a constitutional right and the derivative evidence' " (*People v Jones*, 2 NY3d 235, 242 [2004] [citations omitted]). We have never before excluded any category of evidence from this rule. Fruit of the poisonous tree may be anything "of evidentiary value" (*Davis v Mississippi*, 394 US 721, 724 [1969], quoting *Bynum v United States*, 262 F2d 465, 467 [DC Cir 1958]), including fingerprints (*id.*), photographs (*United States v Crews*, 445 US 463, 472 [1980]), and identifications (*People v Gethers*, 86 NY2d 159, 162 [1995]).

The majority relies heavily on a misreading of *INS v Lopez-Mendoza* (468 US 1032 [1984]). In that case, the United States Supreme Court reviewed two civil deportation proceedings that resulted from illegal police conduct. In the first case, Adan Lopez-Mendoza raised a jurisdictional issue, that he had been summoned to the deportation proceeding as a result of an unlawful arrest. He did not challenge the admissibility of the evidence proffered against him. In the companion case, Elias Sandoval-Sanchez challenged the introduction of illegally

obtained evidence in his deportation proceeding. With respect to Lopez-Mendoza's claim, the Court wrote that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest" (*id.* at 1039). The Fourth, Eighth, and Tenth Circuits read this language as referring only to the court's personal jurisdiction over Lopez-Mendoza, not admissibility of identity evidence (*see United States v Oscar-Torres*, 507 F3d 224, 227-230 [4th Cir 2007]; *United States v Olivares-Rangel*, 458 F3d 1104, 1111-1112 [10th Cir 2006]; *United States v Guevara-Martinez*, 262 F3d 751, 753-755 [8th Cir 2001]). I agree with these courts.

There are several reasons why this reading of *Lopez-Mendoza* is more persuasive than the reading given by the majority. Most importantly, the authority cited for the proposition that a defendant's identity cannot be suppressed refers to an older rule, undisputed here, that the identity of a defendant is never suppressible so as to defeat a court's jurisdiction over that defendant (*Lopez-Mendoza*, 468 US at 1039-1040, citing *Gerstein v Pugh*, 420 US 103, 119 [1975] and *Frisbie v Collins*, 342 US 519, 522 [1952]). As such, the *Lopez-Mendoza* language at issue is found in the section of the opinion addressing Lopez-Mendoza's jurisdictional claim. The Court later addressed Sandoval-Sanchez's claim that the specific identity evidence against him should be suppressed. Rather than applying any "identity rule," as it had when addressing Lopez-Mendoza's jurisdictional claim, the Court held that the exclusionary rule did not extend to deportation proceedings—purely civil proceedings determining a person's eligibility to stay in this country.

I agree with the majority that a defendant's identity cannot be suppressed to defeat the personal jurisdiction of a court. However, identity-related evidence can and should be subject to the exclusionary rule. Indeed, the United States Supreme Court has twice found that fingerprints—paradigmatic identity evidence—are suppressible under the exclusionary rule (*Davis*, 394 US at 724; *Hayes v Florida*, 470 US 811, 815 [1985]). In *Davis*, the Court held that because "[f]ingerprint evidence is no exception" to the exclusionary rule, defendant's illegally obtained fingerprints that matched the perpetrator's fingerprints on file should have been suppressed (394 US at 724). The Court reaffirmed *Davis* in *Hayes* and found that a defendant's fingerprints taken for an investigative purpose in the course of an unlawful detention were inadmissible fruit of that detention (470 US at 816).

Certainly the deterrent purpose of the exclusionary rule should be applicable to identity-related evidence. The majority's "broad[ ] reading of *Lopez-Mendoza* [gives] the police carte blanche powers to engage in any manner of unconstitutional conduct so long as their purpose [is] limited to establishing a defendant's identity" (*Olivares-Rangel*, 458 F3d at 1111). Today's opinion gives law enforcement an incentive to illegally stop, detain, and search anyone for the sole purpose of discovering the person's identity and determining if it matches any government records accessible by the police. Permitting law enforcement to exploit a Fourth Amendment violation that produces identity or identity-related evidence misses the point; what matters is the legality of the police conduct, not the type of evidence obtained.

Of course, this does not mean that identity-related evidence will necessarily be excluded, even if it is the product of an unlawful stop, but merely that it is subject to the same rules as other evidence. It may indeed be admissible, along with other evidence secured as a result of acquiring defendant's pedigree information, if there is an independent source, discovery was inevitable, or the evidence is attenuated from the illegality (*Gethers*, 86 NY2d at 162). If none of these exceptions apply, the records obtained as a result of identity information acquired during an illegal stop are suppressible. Here, however, because Supreme Court made no determination regarding the legality of the stop, we are in no position to determine whether the proffered evidence should be suppressed.

The majority's second argument—that the DMV records are not subject to the exclusionary rule because they were compiled by a state agency independent of any illegality—ignores that the police located these specific records only by relying on identifying information that may have been the product of an illegal stop. Contrary to the majority's opinion, our holding in *People v Pleasant* (54 NY2d 972, 974 [1981]) does not suggest that evidence in possession of a government agency is immune from the exclusionary rule's constraints. In fact, *Pleasant* was entirely premised on the identification at issue being " 'sufficiently distinguishable to be purged of the primary taint' " (*id.*, quoting *Wong Sun v United States*, 371 US 471, 488 [1963] [some internal quotation marks omitted]). In other words, far from holding that identity-related evidence was not subject to suppression, *Pleasant* actually applied the *Wong Sun* analysis and found the evidence at issue to be sufficiently attenuated so

as to be admissible. A similar analysis should have been conducted here.

Nor should it matter that the records were public. Defendant here need not establish a legitimate expectation of privacy in the evidence he seeks to suppress, but only that police discovery of the evidence was the product of a Fourth Amendment violation (*see* Kamins, New York Search and Seizure § 1.01 [5] [a], at 1-22 [2009] [compiling lower court decisions that defendant need not have a "reasonable expectation of privacy in the fruit itself"]). Supreme Court below therefore should have considered "whether exploitation of an illegal search and seizure produced the critical link between a defendant's identity and his [government agency] record[s]" (*Olivares-Rangel*, 458 F3d at 1120).

In short, if these DMV records were discovered as a result of an allegedly unlawful stop, they should be subject to suppression as fruit of that illegality. I would reverse the order of the Appellate Division and remit to Supreme Court for a *Mapp/Dunaway* hearing.

Judges GRAFFEO, SMITH, PIGOTT and JONES concur with Judge READ; Judge CIPARICK dissents and votes to reverse in a separate opinion in which Chief Judge LIPPMAN concurs.

Order affirmed.