# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 10-1271

_____

United States of America,

        Appellee,

v.

James Antoine Faulkner, also known as Hot Rod,

        Appellant.

*
*
*
*
*
*
*
*
*
*
*

Appeal from the United States
District Court for the
Southern District of Iowa.

[PUBLISHED]

_____

Submitted: November 3, 2010
Filed: February 25, 2011

_____

Before MELLOY, HANSEN, and BENTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

Following a jury trial, James Antoine Faulkner was convicted of one count of conspiracy to knowingly manufacture, distribute, and possess with intent to distribute 50 grams or more of crack and heroin (count one); one count of knowingly and intentionally distributing a mixture and substance containing heroin (count two); and one count of knowingly and intentionally distributing a mixture and substance containing crack cocaine (count three). The jury also found that the Government proved beyond a reasonable doubt that heroin distributed pursuant to the conspiracy in count one was a contributing factor in the death of a third party and that the death

was reasonably foreseeable to Faulkner. The district court[1] sentenced Faulkner to life imprisonment on count one and 360 months' imprisonment on counts two and three, to be served concurrently. Faulkner now appeals the convictions, arguing that the district court erred by: (1) failing to suppress evidence seized pursuant to a traffic stop; (2) admitting certain testimony at trial; (3) failing to give requested jury instructions; and (4) denying Faulkner's motion for acquittal. For the following reasons, we affirm.

I.

In 2007, police began to investigate Frederick Benjamin Boyd for distributing drugs and arranged to conduct controlled purchases from him. On December 7, 2007, a confidential informant (CI) met with Boyd, and they drove to Faulkner's apartment in Iowa City, Iowa. Boyd went into Faulkner's apartment, and when he came out he informed the CI that "Hot Rod" (Faulkner) did not have any crack but did have heroin. The officers told the CI to attempt to purchase heroin from Boyd. Later that night, Boyd and the CI returned to Faulkner's apartment and Faulkner sold Boyd .14 grams of heroin. Boyd was later arrested and agreed to cooperate with the police.

On July 1, 2008, police executed a search warrant at Faulkner's residence at 1516 Aver Avenue in Iowa City. During the search, the police found $3,900 in cash in Faulkner's bedroom. Faulkner was present during the search. Officer Jerry Blomgren read Faulkner his Miranda[2] rights, and Faulkner agreed to speak with him without an attorney. Faulkner admitted that he had been supplying Boyd with crack cocaine and identified several of his suppliers.

---

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa.

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

Later that year, on October 5, 2008, officers were called to 1600 Yewell Street in Iowa City, where they located the body of a dead man, Joseph Van Hoe. Van Hoe's brother Martin told police that Van Hoe had purchased heroin earlier in the day from two black men. Van Hoe's body appeared to have a fresh needle mark in one arm, and the police found two hypodermic needles with liquid on the table in front of the body. The liquid was determined to contain heroin, and a later autopsy revealed that Van Hoe had died from ethanol and heroin intoxication. During the ensuing investigation, the police were able to work their way up the chain of sales to Jennifer Debaun. On October 9, 2008, police observed Charles Watson, the man who supplied heroin to Van Hoe, purchase drugs from Debaun in Cedar Rapids, Iowa. Police arrested Watson, who confessed to delivering drugs to Van Hoe on the day of his death, and who said that he had obtained the heroin from Kurt Harrington. At the time, Harrington and Faulkner were living with Debaun.

On October 13, 2008, working with the police, Watson arranged to purchase heroin from Harrington. Officer Blomgren took Watson to the Coral Ridge Mall in Coralville, Iowa. Watson got out of Officer Blomgren's car, eventually got into another vehicle, and met with a man who looked like Harrington and another man who Officer Blomgren testified "looked like" Faulkner, although he could not testify definitively that the man was Faulkner. Watson got out of the vehicle and returned to Officer Blomgren's vehicle, where he turned over six bags of heroin.

Approximately two weeks later, on October 28, 2008, again working with the police, Watson arranged to meet Harrington to purchase heroin at a McDonald's in Iowa City, although Harrington instead provided crack cocaine. Officer Blomgren drove Watson to the McDonald's, observed Watson get out of his car and meet with Harrington, and received four bags of crack cocaine from Watson after his meeting with Harrington.

On October 31, 2008, at around 10:00 pm, Lieutenant Steven Stange of the University of Iowa Police Department stopped a vehicle that he believed had made an illegal left turn against a red light. Unknown to the officer, the defendant Faulkner was driving the car, which was registered to Debaun,[3] and Debaun and Harrington were passengers. Lieutenant Stange approached Faulkner and asked him for his driver's license. Lieutenant Stange ran Faulkner's name through the computer and discovered that a federal arrest warrant had been issued for Faulkner. When additional officers arrived at the scene, the police arrested Faulkner on the oustanding warrant, searched him, and discovered approximately $2,600 in cash on his person. The three were placed in separate patrol cars. The police officers at the scene searched the car and found nothing. A drug dog was then called to the scene, sniffed the vehicle, and alerted officers to the presence of controlled substances by sitting down and staring at the passenger side car door. Lieutenant Stange searched the area near the glove compartment again and discovered a hiding place behind the glove compartment where he found crack and heroin hidden in a sock.

Faulkner was aware of the discovery of the hidden drugs and was removed from the patrol car. Officer Rarick began to administer <u>Miranda</u> warnings to Faulkner, but Faulkner interrupted her and asked to speak with Harrington to find out if Harrington was willing to accept responsibility for the portion of the drugs that belonged to him. Officer Rarick stopped Faulkner from talking so she could finish administering the <u>Miranda</u> warnings. She completed the <u>Miranda</u> warnings, which Faulkner waived. According to her testimony at the suppression hearing, after the <u>Miranda</u> warning but before she asked any questions, Faulkner said that he wanted to talk to Harrington "to make sure [Harrington] owned up because half the drugs belonged to [Faulkner] and half the drugs belonged to Mr. Harrington." (Suppression Hr'g Tr. at 57.)

---

[3]According to testimony, Debaun and Faulkner began dating soon after they met in May 2008. By the middle of July, Faulkner and Harrington had moved in with Debaun in Cedar Rapids.

After his arrest and indictment, Faulkner moved to suppress the evidence recovered and the statements he made after he was stopped by police on October 31, 2008. Faulkner claimed that the traffic stop violated his Fourth Amendment rights because the officer did not have probable cause or reasonable suspicion to stop the vehicle and that the fruit of the unjustified stop included the drugs found in the vehicle and his confession regarding those drugs. The district court denied Faulkner's motion to suppress. The court found that the police did not have probable cause or reasonable suspicion to stop Faulkner's car because there was no traffic violation, so the stop was improper. However, the district court further found that the arrest of Faulkner on the federal arrest warrant was an intervening circumstance that purged the taint of the unjustified stop and that the evidence was therefore admissible.

Faulkner appeals, arguing that: (1) the district court erred in denying his motion to suppress; (2) the district court erred in allowing Debaun's testimony over his objection; (3) the district court erred in denying his request for jury instructions on a buyer-seller relationship and multiple conspiracies; and (4) the district court erred in overruling his motion for a verdict of acquittal.

II.

A.

First, Faulkner asserts that the district court erred in denying his motion to suppress the evidence seized following the October 31 traffic stop. In reviewing a district court's ruling on a motion to suppress, "we review the district court's factual findings for clear error and review *de novo* the court's legal conclusions based on those facts." United States v. Rodriguez-Hernandez, 353 F.3d 632, 635 (8th Cir. 2003). "We must affirm an order denying a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable

law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made."  Id.

Faulkner claims that the district court erred in its analysis of the motion to suppress.  He asserts that the evidence from the stop was the fruit of the poisonous tree of the unjustified traffic stop and therefore should have been suppressed.  Faulkner concedes that *after* the police had his name and determined that there was an outstanding federal warrant for his arrest, they did not act improperly in arresting him on the federal warrant.  (See Appellant's Br. at 29 ("The Appellant does not claim that the officers could not arrest the Appellant after having determined that a federal drug warrant [existed] for his arrest.")); see also United States v. Green, 111 F.3d 515, 521 (7th Cir.) ("It would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant . . . ."), cert. denied, 522 U.S. 973 (1997).  He argues, however, that any statements he made and the drugs found in the vehicle were inadmissible because they were the fruit of the poisonous tree of the unjustified traffic stop.  Faulkner points out that without the unjustified traffic stop, the police would not have had his name and could not have arrested him on the outstanding warrant and would therefore not have discovered the drugs and would not have heard and received Faulkner's statements about the drugs.

We have previously explained that evidence obtained as the result of an unjustified search or arrest "may be admissible if 'the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality.'" United States v. Simpson, 439 F.3d 490, 495 (8th Cir. 2006) (quoting United States v. Crews, 445 U.S. 463, 470 (1980)).  "When determining if sufficient attenuation exists, we must focus on three specific factors: (1) the time elapsed between the illegality and acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the

purpose and flagrancy of the official misconduct." Id. (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).

The discovery of the outstanding arrest warrant for Faulkner applies to the second factor, the presence of intervening circumstances, and weighs in favor of the Government. The parties most strongly disagree about the first factor (the time elapsed between the illegality and the acquisition of evidence), although they also disagree about the third factor (the purpose and flagrancy of the official misconduct).

We addressed the first factor in Simpson, a factually analogous case. In Simpson, police encountered a man whom they mistook for a different individual with an outstanding arrest warrant. After they initially encountered him but before they arrested him, one of the officers realized he was not the man they were looking for, but the officers arrested him anyway. Police identified him and discovered an outstanding warrant for his arrest. After his arrest, Simpson waived his Miranda rights and made certain incriminating statements. Simpson appealed the denial of his motion to suppress evidence found after the arrest and the incriminating postarrest statements.

We assumed that the initial seizure was unjustified, and Simpson asserted that the bullets the police found and the postarrest statements he made were fruit of the poisonous tree that should be suppressed. However, we noted that there was an intervening circumstance: the discovery of Simpson's own outstanding arrest warrant. We noted that, in considering the three specific factors in determining attenuation, when the intervening circumstance is the discovery of an outstanding arrest warrant, the first factor (the time elapsed) "is less relevant because the intervening circumstance is not a voluntary act by the defendant." Id. at 495. We further explained that, "[w]here the discovery of an arrest warrant constitutes the intervening circumstance, 'it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated.'" Id. (quoting Green, 111 F.3d at 522). The court

thus held that "Simpson's outstanding arrest warrant constitute[d] an extraordinary circumstance that purge[d] much of the taint associated with the officers' unconstitutional conduct." Id. at 496.

Faulkner asserts that without the unjustified traffic stop, the police would never have known his name and thus would not have arrested him, relying on Wong Sun v. United States, 371 U.S. 471, 488 (1963), in which the Supreme Court noted that "the more apt question in such a case [of an initially illegal police action] is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 488 (internal quotation marks omitted). Faulkner asserts that the "primary illegality" of the traffic stop necessarily makes the rest of the evidence obtained as a result of the traffic stop inadmissible because the primary taint was not purged. While of course Wong Sun is binding precedent, we are also bound by our own later case, Simpson, and its interpretation of Supreme Court precedent. See United States v. Wright, 22 F.3d 787, 788 (8th Cir. 1994) ("[A] panel of this Court is bound by a prior Eighth Circuit decision unless that case is overruled by the Court sitting en banc."). Thus, we are bound by Simpson's holding that when analyzing the first factor, if the discovery of an outstanding arrest warrant is the second factor's intervening circumstance in analyzing the first factor, much of the taint of an illegal seizure is purged. At oral argument, Faulkner's counsel effectively conceded that we are bound by Simpson. Simpson is directly on point and controls this case. Thus, upon a Simpson analysis, the first factor is of greatly diminished importance.

Finally, we must look to the third factor, the purpose and flagrancy of the official misconduct. In Simpson, we noted that the third factor "is considered the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct." Simpson, 439 F.3d at 496. However, the application of the rule does not serve its purpose when the police action "although

erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." Id. (internal quotation marks omitted). We look at whether the impropriety of the misconduct was obvious or whether the official knew that his conduct was improper but engaged in it anyway and whether the misconduct was committed in the hopes that something might turn up. See id.

Faulkner asserts that Lieutenant Stange's act of stopping Faulkner's vehicle was purposeful and flagrant because, according to Faulkner, "the video makes it clear that [Faulkner's] vehicle entered the intersection before the light had changed from green to yellow and from that time on he was acting in a cautious manner as required by the law." (Appellant's Br. at 27-28.) Faulkner suggests that the red light violation for which he was stopped was merely an excuse or pretext to justify the stop. The district court noted that it viewed the videotape of the traffic stop twenty times and that the video showed Faulkner's vehicle entering the intersection to make a left turn just as the light was turning from green to yellow and proceeded to make the left turn safely. The district court found that Faulkner did not violate the law when turning left at the stoplight, and that therefore Lieutenant Stange acted improperly by stopping the car. However, the district court also found that Lieutenant Stange's action in stopping Faulkner was not flagrant because it was such a close call as to whether Faulkner violated the law when turning left at the stoplight. Having reviewed the video, we conclude that the district court's finding of fact was not clearly erroneous. See Rodriguez-Hernandez, 353 F.3d at 635. There is nothing in the video or in the facts of the case to indicate that Lieutenant Stange's improper conduct was obvious, nothing to signal that it was anything but an honest mistake, nothing to support any contention that Lieutenant Stange knew that his action in stopping Faulkner was likely unconstitutional but engaged in it nonetheless, nothing to suggest that Lieutenant Stange knew it was Faulkner who was driving the car, and nothing to intimate that Lieutenant Stange stopped Faulkner in the hope that something might turn up. See Simpson, 439 F.3d at 496. Thus, the third factor weighs in favor of the Government.

-9-

Accordingly, the district court did not err in denying Faulkner's motion to suppress.[4]

B.

Second, Faulkner challenges the district court's decision to admit particular pieces of Debaun's testimony. "'We review a district court's evidentiary rulings for clear abuse of discretion, reversing only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict.'" United States v. Summage, 575 F.3d 864, 877 (8th Cir. 2009) (quoting United States v. Two Shields, 497 F.3d 789, 792 (8th Cir. 2007)), cert. denied, 130 S. Ct. 1161 (2010). However, if a defendant fails to make a timely objection to testimony, we review the admission of the testimony for plain error. In that instance, we will reverse only if there was an error that was plain and that affected Faulkner's substantial rights and if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 732 (1993) (internal quotation marks and alteration omitted).

Faulkner challenges three statements Debaun made during her testimony. He made timely objections to two of the statements at trial and he failed to object to the third statement at trial. Thus, we review the two statements for a clear abuse of discretion and the third statement for plain error.

The first piece of testimony to which Faulkner objected involved Debaun delivering heroin to Watson at the request of Harrington.

_____

[4]We note that the Supreme Court has recently granted certiorari in People v. Tolentino, 926 N.E.2d 1212 (N.Y.), cert. granted, 131 S. Ct. 595 (2010), to address the question of whether preexisting government documents that reveal an individual's identity but which were obtained as a result of action in violation of the Fourth Amendment are subject to the exclusionary rule.

Q: Did you get any money for delivering—did [Watson] give you any money?
A: Yes.
Q: How much?
A: I believe it was $80.
Q: Could it have been more than that?
A: Yes.
Q: What did you do with that money?
A: I left it in the apartment.
Q: Who got it?
[Faulkner's Counsel]: Objection. Lack of foundation.
[Court]: Overruled. Answer the question, if you know.
[Debaun]: I believe James [Faulkner] did.
Q: Why do you believe that?
A: He had called me and asked me where I had put it and I told him where I put it.

(Trial Tr. at 569-70.)

Faulkner argues that there was no foundation for her testimony that Faulkner retrieved the money and cites Federal Rule of Evidence 602 for the proposition that a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. However, Rule 701 states that a witness not testifying as an expert may offer opinion testimony so long as the testimony is "rationally based on the perception of the witness." Fed. R. Evid. 701(a). "'Personal knowledge or perceptions based on experience' is sufficient foundation for lay opinion testimony." United States v. Smith, 591 F.3d 974, 982 (8th Cir. 2010) (quoting In re Air Crash at Little Rock Arkansas on June 1, 1999, 291 F.3d 503, 515-16 (8th Cir.), cert. denied, 537 U.S. 974 (2002)). Debaun's testimony was rationally based on her perception. Debaun made it clear in her testimony that she merely "believe[d]" that Faulkner took the money and even explained why she believed that. If the jury did not find her belief credible because she did not actually see Faulkner take the money, the jury was free to disregard the

-11-

testimony.  Therefore, the district court did not abuse its discretion in admitting this testimony.

Faulkner also appeals the district court's decision to admit this testimony from Debaun:

> Q: What do you know about how that hiding place came to be?  Wasn't this your car?
> A: Yes.
> Q: And you had just owned that car you said for a few days?
> A: Yes.
> Q: Was that hiding place there when you bought the car?
> A: I'm not understanding what—
> Q: When you bought the car did you know there was a hiding place there behind the glove box or in the glove box?
> A: No.
> Q: But sometime in the week before Halloween you saw them using this glove box as a place to store drugs?
> A: No.
> Q: Tell us what you mean then.
> A: I just know that from reading paperwork.  I don't know from seeing it that night in that car.

(Trial Tr. at 575.)  Faulkner claims that this testimony was hearsay that the district court should not have admitted, although he does not clearly explain why it was inadmissible.  Because Faulkner did not object at trial, we review the admission of the testimony for plain error.  Presumably, Faulkner believes that the hearsay was Debaun's testimony that she knew Faulkner and Harrington were using the hiding place to store drugs "from reading paperwork" and not "from seeing it that night in that car."  The district court did not plainly err by admitting this testimony.  Just prior to the testimony at issue, Debaun testified:

Q: You say the police found drugs in the car [on the night of October 31]?
A: Yes.
Q: Do you know where the drugs were found?
A: In the glove box.
Q: What do you know about that hiding place?
A: I'd seen them put drugs there before.
Q: You had seen who put drugs there before?
A: [Faulkner] and [Harrington].
Q: On different occasions?
A: Yes.

(Trial Tr. at 574.) Thus, Debaun's challenged testimony did not affect Faulkner's substantial rights based on Debaun's other testimony that she knew of the hiding place because she had seen Faulkner and Harrington hide drugs there prior to October 31. Therefore, the district court did not plainly err in admitting Debaun's unobjected to testimony.

Finally, Faulkner objected to testimony involving Debaun's knowledge of the existence of drugs in the vehicle in which she, Harrington, and Faulkner were riding when they were stopped on October 31.

Q: Whose drugs were in that Aurora October 31?
[Faulkner's counsel]: Lack of foundation. I object.
[The Court]: You can answer, if you know.
[Debaun]: Half belonged to [Faulkner] and half belonged to [Harrington].
Q: Why do you think that?
A: I know by—because I just basically know by reading it.
Q: Did you ever—
[Faulkner's counsel]: I object and move to strike.
[The Court]: Let me figure out what she meant by that. I didn't understand what she meant by that. Go ahead.
Q: Did [Faulkner] talk to you about whose drugs those were in the car?
A: He had said half was his and half was [Harrington's].

(Trial Tr. at 580-81.) According to Faulkner, the district court was on notice as to what Debaun meant when she testified that she only knew about the drugs in the car from "reading it" and that it should not have allowed her testimony because it came only from "reading" and not from her personal knowledge.

However, even if this testimony may have initially lacked foundation, Debaun's nearly contemporaneous testimony established that she had personal knowledge based on Faulkner telling her that half the drugs were his and half were Harrington's. Faulkner's statement to Debaun is admissible as an admission by a party-opponent under Federal Rule of Evidence 801(d)(2). "'Even if the district court erred in admitting the evidence, we will not reverse if the admission of the evidence was harmless.'" United States v. Parish, 606 F.3d 480, 487 (8th Cir.) (quoting United States v. Valazques-Rivera, 366 F.3d 661, 666 (8th Cir. 2004)), cert. denied, 131 S. Ct. 580 (2010). Because the statement was otherwise admissible based on Debaun's follow-on testimony, even if the district court erred in initially admitting it, the admission of the testimony was harmless.

## C.

Third, Faulkner claims that the district court should have given the jury instructions on the buyer-seller relationship and on multiple conspiracies. We review a district court's jury instructions for abuse of discretion. United States v. Pereyra-Gabino, 563 F.3d 322, 328 (8th Cir. 2009). Proper jury instructions "must, 'taken as a whole adequately advise the jury of the essential elements of the offenses charged and the burden of proof required of the government.'" Id. (quoting United States v. Rice, 449 F.3d 887, 895 (8th Cir.), cert. denied, 549 U.S. 1040 (2006)). "We will reverse a jury verdict when the errors misled the jury or had a probable effect on the jury's verdict." Id. (internal quotation marks and alteration omitted).

-14-

Faulkner requested, in a timely manner, an instruction that a buyer-seller relationship does not constitute a conspiracy and an instruction regarding single and multiple conspiracies. Faulkner's theories of defense were: (1) that Harrington was involved in two separate conspiracies, one of which distributed crack cocaine and one of which distributed heroin; and (2) that Faulkner's single sale of a user amount of heroin to Boyd was not enough to support a finding that he knew or agreed to be a member of a conspiracy with Harrington that sold heroin. "'A defendant is entitled to an instruction explaining his defense theory if the request is timely, the proffered instruction is supported by the evidence, and the instruction correctly states the law.'" United States v. Adams, 401 F.3d 886, 898 (8th Cir.) (quoting United States v. Hester, 140 F.3d 753, 757 (8th Cir. 1998)), cert. denied, 546 U.S. 966 (2005). Here, there is no question that Faulkner's requests for the proposed instructions were timely, and the Government does not appear to dispute that the proposed instructions correctly stated the law. Thus, the issue before us is whether the instructions were supported by the evidence.

First, the proffered jury instruction (Eighth Circuit Model Jury Instruction 5.06G on single versus multiple conspiracies) was not supported by the evidence. The proposed instruction would have informed the jury that multiple conspiracies may exist with different criminal purposes, and the Government must prove that the defendant was part of one single conspiracy instead of multiple conspiracies. Faulkner asserts that Harrington was involved in two separate conspiracies, one to distribute crack cocaine and one to distribute heroin, and that Faulkner was only a part of the separate conspiracy to distribute crack cocaine. "Whether a given case involves single or multiple conspiracies depends on whether there was one overall agreement to perform various functions to achieve the objectives of the conspiracy." United States v. Radtke, 415 F.3d 826, 838 (8th Cir. 2005) (internal quotation marks omitted). We look at the totality of the circumstances and review this as a question of fact, drawing all inferences in favor of the jury verdict. Id.

Here, drawing all inferences in favor of the jury verdict, there was no evidence of multiple conspiracies that would support Faulkner's proposed instruction. There was testimony that Faulkner and Harrington were partners and sold drugs together every day. Police found heroin and crack cocaine together in the car on the night of the October 31 traffic stop, and Faulkner admitted to Debaun that half of the drugs were his and half were Harrington's. Faulkner asked Debaun where the proceeds from the heroin Harrington sold to Watson were, and Debaun testified that she believed Faulkner took the money. The testimony supports the Government's position that there was only one conspiracy, and there was no evidence that Harrington was involved in a second conspiracy to sell only heroin apart from his conspiracy with Faulkner.

Second, the proffered jury instruction regarding the buyer-seller relationship was not supported by the evidence. The proposed instruction stated that "the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction." (Add. at 18.) Faulkner asserts that the only direct evidence that Faulkner was involved in distributing heroin was when, on December 7, 2007, he sold heroin to Boyd. Faulkner asserts that he sold heroin on only that one occasion when he apparently did not have any crack cocaine.

However, the evidence does not support Faulkner's assertion that he only distributed heroin once. At trial, besides the testimony regarding the December 7 transaction, there was also testimony from Boyd that he had purchased crack cocaine from Faulkner well over 100 times and had purchased heroin from Faulkner on "five or six occasions, anywhere from a gram to a half a gram." (Trial Tr. at 161.) There was further testimony from Debaun regarding the conversation about the proceeds from the sale of heroin to Watson and that half the drugs in the car on the night of October 31 (which included both crack cocaine and heroin) were Faulkner's. The evidence simply does not support Faulkner's proposed buyer-seller jury instruction.

-16-

Accordingly, the district court did not abuse its discretion in refusing to give Faulkner's proposed jury instructions.

D.

Finally, Faulkner claims that the district court erred in denying his motion for acquittal based on insufficient evidence. Faulkner made a timely motion for acquittal at the close of the Government's evidence, which the district court denied. We review the denial of a motion for a judgment of acquittal *de novo*, with all evidence viewed in the light most favorable to the nonmoving party, the Government. United States v. Robertson, 606 F.3d 943, 953 (8th Cir. 2010). We will reverse only if no reasonable jury could have found Faulkner guilty beyond a reasonable doubt. See id.

Faulkner argues that: (1) there was not sufficient evidence to support the conspiracy conviction; and (2) there was not sufficient evidence to support a finding beyond a reasonable doubt that it was reasonably foreseeable that the heroin would cause a death.

Faulkner first argues that there was insufficient evidence to support his conspiracy conviction. Faulkner asserts that he was not a part of or aware of a conspiracy to distribute heroin. "A single conspiracy is composed of individuals sharing common purposes or objectives under one general agreement." United States v. Donnell, 596 F.3d 913, 923 (8th Cir.) (internal quotation marks omitted), cert. denied, 131 S. Ct. 309 (2010). Further, "a conspiracy with multiple objectives is not the same thing as multiple conspiracies." United States v. Santisteban, 501 F.3d 873, 882 (8th Cir. 2007) (internal quotation marks omitted).

As discussed above, there was a great deal of evidence that Faulkner was involved in a single conspiracy with Harrington to distribute drugs, both crack cocaine and heroin. Boyd testified that he purchased heroin from Faulkner five or six times

-17-

and crack cocaine from Faulkner more than 100 times. On December 7, 2007, when Boyd purchased drugs from Faulkner, Faulkner had heroin for sale but not crack. Debaun testified that Faulkner and Harrington were equal partners in the drug distribution business and were together dealing drugs every day. When Debaun was involved in a drug transaction distributing heroin at the request of Harrington, Faulkner inquired about the proceeds. Both crack cocaine and heroin were found hidden in the car on October 31, and Faulkner told Debaun that half the drugs were his and half were Harrington's. Viewing the evidence in the light most favorable to the Government, there was sufficient evidence to support Faulkner's conviction for conspiracy to distribute heroin, and the district court did not err in denying his motion for acquittal. See Robertson, 606 F.3d at 953.

Faulkner next argues that there was insufficient evidence to support a finding beyond a reasonable doubt that it was reasonably foreseeable to Faulkner that the distributed heroin would cause a death. See 21 U.S.C. § 841(b)(1)(A) (setting a minimum sentence of 20 years' imprisonment and a maximum sentence of life imprisonment for distributing drugs "if death or serious bodily injury results from the use of such substance"). Faulkner asserts that even if there was evidence to tie Faulkner to the distribution of heroin, it was not sufficient to prove beyond a reasonable doubt that death would result from the heroin distribution.

Here, Faulkner did not personally play a direct role in the manufacture or distribution of heroin that resulted in Van Hoe's death. Instead, he would be subject to the sentence enhancement based solely on Harrington's actions as a coconspirator. See 21 U.S.C. § 846. As a court, we have not resolved the issue of whether someone in Faulkner's position would be strictly liable for the resulting death or would be liable only if the death was reasonably foreseeable, although we have suggested that a defendant may be liable as a coconspirator only if the death was reasonably foreseeable. In United States v. McIntosh, 236 F.3d 968, 973 (8th Cir.), cert. denied, 532 U.S. 1022 (2001), we held that "when a conspiracy defendant plays a direct role

in manufacturing or distributing a drug that results in death, Congress's intent under [21 U.S.C.] § 846 is clear that the defendant is strictly liable under § 841(b)(1)(A)'s enhancement scheme."  Alternatively, we noted that if the defendant did not play a direct role in the manufacture or distribution of a drug that resulted in death and the enhancement was based solely on the conduct of a coconspirator, "a foreseeability analysis *may* be required in determining whether Congress intended, under § 846, that the defendant be held accountable for the conduct of a coconspirator."  Id. at 974.

The district court, exercising commendable caution, instructed the jury to find Faulkner responsible for the death of Van Hoe only if it found beyond a reasonable doubt that the death was "reasonably foreseeable . . . to Faulkner."  (R. at  84.)[5] Faulkner asserts that there was insufficient evidence to support the jury's finding that Van Hoe's death was reasonably foreseeable to him.  While Faulkner may not have played a direct role in manufacturing or distributing the heroin that caused Van Hoe's death, he was part of the conspiracy that distributed the heroin.  The Eleventh Circuit has stated that "[w]here a conspirator is involved in distributing drugs to addicts, some of which are even administered intravenously, it is a reasonably foreseeable consequence that one or more of those addicts may overdose and die."  United States v. Westry, 524 F.3d 1198, 1219 (11th Cir. 2008), cert. denied, 129 S. Ct. 251 (2008), and cert. denied, 129 S. Ct. 902 (2009).  The court held that "[b]ecause [decedent] died from a drug overdose from drugs distributed by a member of the conspiracy[,] . . . and the goal of the conspiracy was to distribute drugs, [decedent's] death was reasonably foreseeable and within the scope of the conspiracy."  Id. at 1220.  At trial, the Government offered evidence that Faulkner was part of the conspiracy whose goal was to distribute drugs, including heroin, that Faulkner himself sold heroin to others, and that Van Hoe died from a drug overdose from heroin distributed by Harrington,

---

[5]Because the court so instructed the jury, we still need not—and do not—decide whether a defendant could be strictly liable for a coconspirator's actions in manufacturing or distributing a drug that resulted in a death.  Further, we see no error in the district court's handling of the matter.

another member of the conspiracy.  Cf. United States v. Ragland, 555 F.3d 706, 715 (8th Cir. 2009) (upholding the death enhancement when the defendant knowingly supplied heroin to the decedent that caused the decedent's death).  Therefore, viewing the evidence in the light most favorable to the Government, there was sufficient evidence to support the jury's finding that Van Hoe's death was reasonably foreseeable to Faulkner.  See Robertson, 606 F.3d at 953.

## III.

Accordingly, the judgment of the district court is affirmed.

_____