# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-3004

_____

United States of America,

        Appellee,

v.

Traves Rush,

        Appellant.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of Nebraska.
\*
\*
\*

_____

Submitted: June 17, 2011
Filed: August 15, 2011

_____

Before RILEY, Chief Judge, GRUENDER, Circuit Judge, and LIMBAUGH,[1] District Judge.

_____

RILEY, Chief Judge.

On October 6, 2008, three masked men robbed a TierOne Bank in Lincoln, Nebraska. Police arrested Traves Rush and two companions for the robbery. The district court[2] denied Rush's motion to suppress evidence and the case proceeded to

---

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

trial. A jury found Rush guilty of bank robbery and the district court sentenced him to 168 months imprisonment. Rush appeals his conviction. We affirm, and deny Rush's pending motion to strike as moot.

## I. BACKGROUND

At 9:08 a.m. on October 6, 2008, Rush and Curtis Cotton left the Community Corrections Center in Omaha, Nebraska (CCC-Omaha) without permission.[3] Marcus Short picked up Rush and Cotton at CCC-Omaha and the three agreed to rob a TierOne Bank some 60 miles away in Lincoln, Nebraska. Rush had been inside the bank before and knew where everything was. Short provided clothes for the robbers to wear and gave Cotton a hammer, which Rush told Cotton to use to open drawers and to "control the floor" by using the hammer "as a scare."

Short drove Rush and Cotton to Lincoln in his dark gray Chevrolet Caprice, which they parked in a parking lot at a local religious college. A security video camera recorded Rush stealing a light blue Chrysler LeBaron from the lot. Rush drove the stolen Chrysler away, and Short and Cotton followed Rush to the parking lot of an apartment complex a short distance from the bank and from there to an alley nearby. The robbers masked their faces with clothing and dark sunglasses and donned gloves to avoid later identification. Short and Cotton joined Rush in the stolen Chrysler and Cotton drove to the bank.

The robbers entered the bank at 12:09 p.m. Although surveillance cameras recorded the robbery, the robbers cannot be identified from the recordings. During the robbery, an assistant manager escaped from the bank, observed the robbers leave the

---

[3]CCC-Omaha is a facility operated by the Nebraska Department of Correctional Services. CCC-Omaha provides work detail and work release services to Nebraska prison inmates, normally those nearing the end of their sentence or with pending parole hearings.

scene in the light blue Chrysler, and called the police. The robbers stole $26,500.42 of the bank's federally insured money.

The robbers returned to the alley near the apartment complex, abandoned the blue Chrysler, and drove away in the Caprice. They stopped behind a grocery store and threw the hammer, gloves, and some of their more recognizable clothing into a dumpster. Short took over the driving for the return trip to Omaha. Cotton and Rush were anxious to get back to CCC-Omaha in time for the 1:15 p.m. head count.

At about 12:15 p.m., a police radio dispatcher announced the bank robbery, notifying police that three black males and a blue Chrysler Lebaron were involved. Later radio reports indicated officers had found the blue Chrysler abandoned, and there was a possibility the robbers might then be in "a red Chrysler or some type of a red vehicle" and that "there was a white male in the mix."

About 12:40 p.m., Lancaster County Deputy Sheriff Kirk Price arrived at an intersection on the northeast edge of Lincoln. Deputy Price heard the police radio dispatches and drove to the intersection "hoping to spot the robbery suspects traveling out of Lincoln toward Interstate 80." With the same strategy, Lincoln Police Officer Mark Johnson parked three or four blocks east of the intersection, within sight of Deputy Price's car. Two or three minutes later, Deputy Price spotted the dark gray Caprice containing three black males and began following it. Officer Johnson also followed, but was further back due to traffic. Cotton and Rush saw Deputy Price following them and began to secret the stolen money under the car's seats. Cotton also stuffed some of the cash down his pants.

Both police cars followed the dark gray Caprice, but neither activated its lights or siren. After a little less than two miles, the Caprice entered the parking lot of a large pharmaceutical company, stopping by the main entrance. Cotton exited the Caprice and entered a building. When he got inside, Cotton asked to use the restroom,

but a security guard directed him to one outside the building. Meanwhile, Short parked the Caprice in an angled parking stall. Deputy Price parked behind the Caprice, but did not obstruct the Caprice's exit with his cruiser.

Rush got out of the Caprice and Deputy Price got out of his cruiser. Deputy Price approached Rush and in a "normal conversation" tone of voice asked Rush "what they were doing there, where they were headed or where they had come from." Rush told Deputy Price "they were from Omaha, en route to Omaha," and that Cotton was inside visiting his mother. At that moment, Cotton reappeared. Deputy Price noticed Cotton had a thick roll of cash stuck in the top of one of Cotton's athletic shoes. The money had fallen down Cotton's pant leg to the top of his shoe. Deputy Price seized the cash and arrested Cotton.

Officer Johnson arrived, parking behind Deputy Price's cruiser, and again not obstructing the Caprice. Officer Johnson observed Deputy Price taking the money from Cotton and "took hold" of Rush, placing him in the back of Officer Johnson's police cruiser. As Cotton and Rush were being arrested, Short backed the Caprice out of its parking place and drove away. However, Short could not find the parking lot's exit and circled the lot, returning to where Deputy Price's cruiser was. Cotton observed Short "began to hop out [of] the car while the car still rolled." The Caprice rolled into a parked vehicle. Short ran, and Officer Johnson gave chase on foot.

Officer Johnson eventually arrested Short in a field on the north side of the highway. As Officer Johnson chased Short, the owner of the car the Caprice rested against came out of the building for her lunch break. Deputy Price prepared to move the Caprice so the woman could leave. Finding the Caprice still running, Deputy Price backed up the Caprice enough to allow the other car to exit, placed the Caprice in park, shut off the engine, and took the keys. Deputy Price did not search the Caprice.

Lincoln Police Officer Larry Bratt arrived on the scene and processed the Caprice. Before entering the car, Officer Bratt observed and photographed a wad of cash, two bank bags, and a plastic bag full of currency inside the Caprice. During a search of the Caprice, police found cash, including "bait bills," several bank bags, and black overalls similar to those appearing in the bank surveillance video. Police later found $8,850 hidden in the back of one of the cruisers. When Rush and Cotton were being held in a cell together before a court appearance, Rush told Cotton that Rush hid some of the money from the robbery in the back seat of the cruiser.

On October 21, 2009, a grand jury indicted Rush and Short for bank robbery, in violation of 18 U.S.C. § 2113(a). Rush moved to suppress the evidence seized from the Caprice, arguing (1) Deputy Price unconstitutionally seized him when "[Deputy] Price demanded of Rush that he answer questions related to his purpose and reason for being at [the pharmaceutical company]," and (2) no reasonable suspicion or probable cause existed to search the Caprice. Acting on a recommendation from the magistrate judge,[4] the district court denied Rush's motion to suppress, finding

> the parking of the gray vehicle . . . did not implicate the Fourth Amendment; Mr. Rush's initial contact with Deputy Price was consensual . . . ; the seizure of Mr. Rush by Officer Johnson was supported by a reasonable, particularized suspicion that Mr. Rush was involved in a bank robbery; and the search of the gray vehicle did not violate the Fourth Amendment.

At trial, Cotton gave detailed testimony implicating Rush in the robbery. Rush testified in his own defense and swore that he had been in Lincoln that day looking at apartments with a woman from Omaha, who could not testify in his defense because she had recently died. Rush implied the woman and he were romantically involved, but that she asked him to leave her vehicle because she thought he was "stepping out

---

[4]The Honorable Cheryl R. Zwart, United States Magistrate Judge for the District of Nebraska.

on her." Along came Cotton and Short, who, according to Rush, agreed to drive him back to CCC-Omaha. Deputy Price began following them a short time later. The government called the deceased woman's sister and best friend in rebuttal, both of whom testified the deceased woman had never personally known Rush.

The jury found Rush guilty as charged. The district court sentenced Rush to 168 months imprisonment and 3 years supervised release. This appeal followed. After Rush noticed his appeal, the grand jury indicted Rush for making a false material declaration, in violation of 18 U.S.C. § 1623, by falsely testifying that he had come to Lincoln with the deceased woman and was "looking at apartments and riding in her car with her" "immediately preceding and during the bank robbery." Pursuant to a plea agreement, Rush pled guilty to the crime. In an addendum to its brief in this case, the government attached documents showing Rush's admissions that his statements were false. Rush moves to strike these documents, arguing they are irrelevant and "not part of the record on appeal." This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.    DISCUSSION
### A.    Deputy Price's Initial Contact with Rush

Rush argues the district court erred in denying his motion to suppress because his initial contact with Deputy Price was not consensual. Rush contends Deputy Price seized him in an investigatory stop and that Deputy Price's failure to articulate a reasonable suspicion that criminal activity was afoot renders the seizure unconstitutional. "This court reviews the district court's factual determinations in support of its denial of a motion to suppress for clear error and its legal conclusions de novo." United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008). "This court will affirm the district court's denial of a motion to suppress evidence unless it is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." Id.

> [A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," California v. Hodari D., 499 U.S. 621, 628 (1991), the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.

Florida v. Bostick, 501 U.S. 429, 434 (1991).

Rush argues Deputy Price's questioning was not consensual because (1) Deputy Price's cruiser followed the Caprice for almost two miles until it parked at the pharmaceutical company, (2) Rush did not have an opportunity to avoid Deputy Price when Rush exited the Caprice, (3) Deputy Price was in uniform, had a marked police cruiser, and had a holstered service weapon, and (4) Deputy Price asked Rush where they were from and going and what they were doing. Rush admits "many of the factors commonly cited as objective evidence of coercion (i.e., display of weapon, physical touching) are not present," but argues that "the way the situation played out in the parking lot . . . , the instantaneous nature of the events, the length of time and the closeness at which the Chevy Caprice was followed by the deputy, all would lead one to conclude that [Rush] was not free to simply ignore Deputy Price."

Although Rush may have subjectively felt the circumstances compelled him to speak to Deputy Price, the law is clear that absent a restraint of liberty, police questioning occurs with the citizen's consent, and does not constitute an investigative stop requiring reasonable suspicion. See Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968) ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). Deputy Price followed the Caprice for some distance, did not use his lights or siren to stop the Caprice, did not obstruct the vehicle's exit from

-7-

the parking lot when it stopped, and approached and asked Rush about his plans and purpose for being in the parking lot. Deputy Price did not use any physical force or issue any orders, and the deputy made no show of authority beyond that which an officer necessarily exudes whenever he or she engages in consensual questioning. See, e.g., United States v. Barry, 394 F.3d 1070, 1075 (8th Cir. 2005) ("[The officer's] conduct in approaching Barry's parked vehicle and knocking on the window did not amount to a show of authority such that a reasonable person would believe he was not at liberty to ignore [the officer's] presence and go about his business."). Rush does not cite any authority requiring police to provide an "opportunity to avoid" them before asking questions. The district court did not err in finding a consensual encounter under these circumstances.

## B.     Reasonable Suspicion

Rush contends Officer Johnson violated his Fourth Amendment rights by seizing Rush and placing him in the back of his police cruiser. It is well settled that a warrantless search or seizure is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted). "One such exception was recognized in Terry[, 392 U.S. at 30], which held that 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . ,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." Minnesota v. Dickerson, 508 U.S. 366, 372-73 (1993). In other words, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion." United States v. Hensley, 469 U.S. 221, 229 (1985).

Rush argues that "[e]ven if the initial encounter between [Rush] and Deputy Price was consensual," there was insufficient evidence that criminal activity was afoot

-8-

to support a reasonable suspicion on an officer's part to place Rush in the back of his cruiser. We disagree.

Less than 30 minutes before Deputy Price began following the Caprice, police dispatch announced a bank robbery involving three black males. A dispatcher also mentioned a blue Chrysler LeBaron, some type of red vehicle, and a white male as possibly being involved in the robbery. Both Deputy Price and Officer Johnson responded to the call by positioning themselves to observe a common road exiting the city. The Caprice, which Deputy Price opined looked "so easily disposable," appeared, containing three black males. The officers followed the Caprice, but did not stop it. The Caprice entered the pharmaceutical company's parking lot and Cotton went inside. Deputy Price did not detain Cotton. Rush exited the Caprice and Deputy Price approached and asked Rush a few basic questions. Rush responded, and Deputy Price did not detain Rush at that time.

It was not until Deputy Price saw the large roll of currency in Cotton's shoe that the deputy detained Cotton. Although Deputy Price did not know with precision how much money was in Cotton's shoe when he detained him, an indication of the money roll's size is that it was later determined to contain $1,942. We have recognized possession of a large amount of currency shortly after a bank robbery may be sufficient to support a brief investigatory detention. Cf. United States v. Olson, 262 F.3d 795, 797-98 (8th Cir. 2001) (finding reasonable suspicion, among other reasons, when two days after a robbery, a tipster told police she suspected certain people because the day after the robbery one shaved his head, the other his beard, and they possessed a large amount of cash). Here, a bank in the area had been robbed within the hour. Rush, Cotton, and Short met the general description of the robbers, they were leaving town, and Cotton had a large amount of currency in his shoe. A brief investigative detention was warranted under these circumstances. And Short's flight upon seeing his companions detained obviously justified their continued investigatory detention. We reject Rush's Fourth Amendment arguments.

-9-

## C. Remaining Issues

Rush argues the district court erred in excluding as hearsay the evidence of police radio calls suggesting the bank robbers' car was red. Rush asserts he was eliciting the evidence, not for its truth—that the robbers were in a red car—but rather to show its effect on Deputy Price and to impeach Cotton and the officer that processed the light blue Chrysler. But Rush does not explain how he was prejudiced by the alleged error. Even if Rush could show Deputy Price followed the Caprice for some improper reason, Rush's detention was lawful because Deputy Price did not arrest Cotton until he could articulate a reasonable suspicion to do so. And Rush's conviction rests primarily on Cotton's testimony and on evidence found in the Caprice, not on evidence found in the Chrysler. Any error is harmless. See United States v. Neadeau, 639 F.3d 453, 456 (8th Cir. 2011) (standard of review). This issue does not compel reversal.

Rush challenges the sufficiency of the evidence to sustain his conviction. "We review the sufficiency issue *de novo*, viewing the evidence in the light most favorable to the guilty verdict, resolving conflicts in favor of the government, and accepting all reasonable inferences that support the jury's verdict." United States v. Causevic, 636 F.3d 998, 1005 (8th Cir. 2011). Rush argues the only evidence tying him to the robbery is Cotton's testimony, Cotton's credibility is low, and Rush's testimony that he was picked up hitchhiking by Cotton and Short after the robbery was bolstered by a former Cotton cellmate. But this court has repeatedly held "[d]eterminations of witness credibility . . . are within the province of the jury and 'virtually unreviewable on appeal.'" United States v. McCraney, 612 F.3d 1057, 1063 (8th Cir. 2010) (quoting United States v. Thompson, 560 F.3d 745, 748-49 (8th Cir. 2009)). The jury was entitled to find Cotton credible, and we will not disturb that finding on appeal. See United States v. Brown, 408 F.3d 1049, 1051 (8th Cir. 2005) ("The jury was entitled to disbelieve witness testimony that may have been inconsistent with a finding that Brown was the robber.")

Rush also argues "[t]here is no physical evidence tying him to the bank or the getaway car. There are no identifications which place him at the scene of the crime." "[E]yewitness identification is not required to support a conviction." Id. (citing United States v. Crenshaw, 359 F.3d 977, 993 (8th Cir. 2004)). And Rush's argument ignores several facts, including Cotton's identification of him as one of the robbers, Rush's presence in a car littered with evidence from the robbery, and the discovery of $8,850 in the police cruiser in which Rush was detained. Rush's sufficiency challenge is not meritorious.

Lastly, Rush moves to strike the addendum to the government's brief, which contains documents related to his guilty plea for making a material false declaration while testifying in his own defense in this case. Because the challenged evidence is only relevant to the sufficiency issue discussed above, and because the evidence in this case is otherwise sufficient to support Rush's conviction, it is unnecessary for us to rule on the merits of Rush's motion and we deny it as moot.

## III.   CONCLUSION

We affirm Rush's conviction, denying his pending motion to strike as moot.

_____