# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2996
_____

United States of America,       *
                                *
       Appellee,           *
                                *   Appeal from the United States
   v.                        *   District Court for the
                                *   Southern District of Iowa.
Vincente Carrasco Espinoza, Jr.,   *
                                *
       Appellant.         *

_____

Submitted: April 19, 2012
Filed: July 13, 2012
_____

Before WOLLMAN, BYE, and BENTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Vincente Carrasco Espinoza, Jr. (Carrasco) appeals his conviction for conspiracy to distribute cocaine and methamphetamine (count one), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 846, and possession with intent to distribute cocaine and methamphetamine (count ten), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (b)(1)(B). We affirm.

I.

Because one of Carrasco's principal points on appeal is his challenge to the sufficiency of the evidence, it is necessary to discuss that evidence in some detail.

The government presented evidence of a drug conspiracy in which Carrasco distributed multiple pounds of methamphetamine and cocaine from a "stash house" located on East 7th Street in Des Moines, Iowa. Juan Antonio Toledo Ayala was sent from Chicago, Illinois, to Des Moines to run the stash house beginning in August of 2008. Shortly thereafter, Ayala was introduced to Carrasco, who said he was "a friend" of an individual named "Eivar" who had sent Ayala to Des Moines. Tr. 99, 54. Carrasco, Ayala, and Eivar all shared family ties to the same town in Mexico. Carrasco and Eivar directed the flow of drugs and money to and from the stash house.

Carrasco bought and resold seventeen pounds of methamphetamine that had been stored at the stash house by the time of Ayala's arrival in Des Moines. Carrasco's purchases usually occurred in one or two pound increments, at $20,000 per pound. Ayala sent the proceeds of these sales to California or Arizona as directed by Eivar. In November or December of 2008, Eivar sent a courier to Iowa with a kilogram of cocaine, met the courier, and brought the cocaine to Ayala at a hotel. Ayala in turn sold the shipment to Carrasco for $29,000 and helped Carrasco sell the cocaine. Some of the cocaine was sold to "Chava," who was later identified as Salvador Rios, Sr. For the transaction with Rios, Sr., Carrasco picked Ayala up from the stash house, took him to Rios, Sr.'s apartment, and had Ayala deliver the cocaine. Additional sales to Rios, Sr. followed, though Carrasco rarely delivered the drugs himself.

In late 2008, Eivar shipped an additional eleven pounds of methamphetamine to Des Moines for distribution from the stash house. Carrasco arranged for the sale of seven pounds of the shipment. Because Eivar was dissatisfied with Carrasco's

inability to sell the remaining four pounds, he did not immediately send additional drugs to the stash house. At that point, Carrasco arranged for drug deliveries from a different source. Between January and April of 2009, Carrasco and Ayala obtained three or four shipments of methamphetamine brought to Iowa by a female courier traveling via Greyhound bus. Each shipment brought four to five pounds of methamphetamine.

In April or May of 2009, Eivar resumed sending drugs to the stash house. This time, the drugs were delivered in a semi-tractor trailer. Ayala retrieved the drugs from the trailer, took them to the stash house, and distributed the drugs as ordered by Carrasco. The first trailer delivery contained eleven kilograms of cocaine and three pounds of methamphetamine; the second delivery contained eleven kilograms of cocaine. From these deliveries, Carrasco was able to arrange for the sale of one kilogram of cocaine and two pounds of methamphetamine. Twenty kilograms of cocaine were returned unsold, and the rest of the drugs remained in the stash house.

Law enforcement learned of these illicit drug operations after Ayala was arrested on an outstanding warrant during a traffic stop on June 4, 2009. Police found two mobile phones and a bag of money orders in Ayala's car. The next day, agents obtained and executed a search warrant for the stash house. Agents found methamphetamine, cocaine, money orders, buckets of MSM,[1] packaging materials, digital scales, drug notes, and more than $30,000 in cash at the house.

Ayala agreed to cooperate with authorities and described in detail his drug activities, as well as those of Carrasco, Eivar, Rios, Sr., and others. Further investigation corroborated Ayala's description of the drug ring. Ayala kept a ledger to document expenses from the stash house operation, several entries in which

---

[1]"MSM," or dimethyl sulfone, is commonly used as a "cutting agent" to dilute cocaine or methamphetamine for higher profits.

matched seized money order receipts.  The ledgers also reflected money owed by "Chava," which was Rios, Sr.'s nickname.  Ayala also described Carrasco's truck and told agents where Carrasco lived.  Agents verified that the house belonged to Carrasco and observed the truck Ayala described parked at the residence.

Authorities already had been investigating Rios, Sr. before Ayala's arrest.  Between December of 2008 and April of 2009, police made several purchases of cocaine from Rios, Sr and his son through a confidential informant.  These sales led to Rios, Sr.'s arrest on federal drug trafficking charges.

Rios, Sr. cooperated with authorities.  He corroborated Ayala's account of Carrasco's drug operation.  Initially, Rios, Sr. bought drugs directly from Carrasco.  Later, Carrasco introduced Rios, Sr. to Ayala,[2] who took over the job of delivering drugs for Carrasco.  After Ayala's arrest, Rios, Sr. again dealt directly with Carrasco, who then sold "ice" methamphetamine instead of cocaine to Rios, Sr.  Tr. 279-80.  Carrasco mentioned his drug connections, telling Rios, Sr. that he had a brother with "good relationships with the people of Michoacan."  This left Rios, Sr., who was aware of a drug cartel in Michoacan, Mexico, known as "La Familia," "a little" scared.

Rios, Sr.'s account of his drug involvement was corroborated by his son and one of his regular customers, Sandra White.  In addition, observations made by agents during their investigation matched Rios, Sr.'s descriptions of events, as surveillance officers watched Carrasco pick Rios, Sr. up, drive him around the block, and drop him off at the same location at which he had been picked up moments earlier.

Seized phone records and text messages provided more evidence of Carrasco's participation in illegal drug trafficking.  Ayala explained that he and Carrasco used

---

[2]Rios, Sr. knew Ayala by the alias "Jorge."  Tr. 90.

coded text messages to communicate — substituting the word "car" for "methamphetamine," "tires" or "hours" for "ounces," and "pages" for "money." Some of these text messages remained on Ayala's phone at the time of his arrest. In one, Carrasco asked Ayala if he already had added a cutting agent to a pound of methamphetamine. In another, Carrasco informed Ayala that he had spoken to a customer who wanted two ounces of drugs. Similar text messages were exchanged between Ayala and Rios, Sr. In addition to the text messages, police also seized phone records showing more than 100 contacts between Carrasco and Rios, Sr. during the course of the conspiracy.

Police executed a search warrant at Carrasco's house on August 5, 2010. Carrasco was in Mexico at the time, but his wife and children were home. No drugs were found at the house, but agents did find large amounts of expensive apparel, such as "at least a dozen jeans that still had the price tags affixed, and the prices varied, but were mostly over $300." Agents also found expensive vehicles at the house, including a Chevrolet Tahoe SUV and a Polaris ATV. Further investigation revealed that Carrasco had paid several thousand dollars in cash as a down payment for the ATV. Agents also found a number of firearms and ammunition in the home. At trial, the government presented testimony that guns are known tools of the drug trade, used to protect assets or property.

Carrasco testified at trial and denied any involvement in drugs. He admitted that his father and brother in Mexico were involved in the drug trade and had fled the United States to avoid prosecution. He also admitted that law enforcement correctly attributed various phone numbers to him. He insisted, however, that all his contacts with other members of the conspiracy were innocent.

Carrasco denied knowing several people who appeared frequently in his call history and were linked by other evidence to the conspiracy. For example, Rios, Sr. testified that Carrasco introduced him to a customer for "ice" methamphetamine

named "Ramos." Carrasco denied knowing anyone by the name of "Ramos," despite the fact that phone records showed contact between his phone and the phone of "A. Ramos" twenty-six times in a two-week period. As another example, one of the money orders seized from the stash house showed $400 going to an "Alfredo Callejri" in Salt Lake City, Utah. Tr. 186, Exh. 38. Carrasco's phone was in contact with a phone belonging to Callejri 130 times between January and May of 2010. Carrasco, however, claimed that he did not know Callejri and had no idea why he would have contacted Callejri 130 times.

Carrasco denied that his handwriting appeared on drug notes found at the stash house, though he was confronted at trial with marked similarities between the handwriting on one note and the handwriting on one of his employment applications. He also denied any drug trading occurring during his brief drive around the block with Rios, Sr. that was witnessed by surveillance teams. Instead, he insisted that he had simply given Rios, Sr. a ride as requested, and he had no explanation for the short duration of the ride or for why the destination of the ride was the same as its origin.

The jury found Carrasco guilty of counts one and ten. The district court[3] denied Carrasco's motions for judgment of acquittal and a new trial and sentenced him to 240 months' imprisonment on both counts, to be served concurrently.

II.

A. Sufficiency of the Evidence

Carrasco argues that the evidence at trial was insufficient to convict him either of conspiracy as charged in count one, or of possession with the intent to distribute,

---

[3]The Honorable James E. Gritzner, Chief Judge, United States District Court for the Southern District of Iowa.

-6-

as charged in count ten. Challenges to the sufficiency of the evidence are reviewed *de novo*. United States v. Payton, 636 F.3d 1027, 1042 (8th Cir. 2011) (citation omitted). "[W]e view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." United States v. Milk, 447 F.3d 593, 598 (8th Cir. 2006) (citing United States v. Cline, 570 F.2d 731, 733 (8th Cir. 1978)). "We must affirm a jury verdict if, taking all facts in the light most favorable to the verdict, a reasonable juror could have found the defendant guilty of the charged conduct beyond a reasonable doubt." United States v. Balanga, 109 F.3d 1299, 1301 (8th Cir. 1997) (citing United States v. Matra, 841 F.2d 837, 840 (8th Cir. 1988)). "A conviction may be based on circumstantial as well as direct evidence." United States v. Erdman, 953 F.2d 387, 389 (8th Cir. 1992) (citing United States v. Mallen, 843 F.2d 1096, 1099 (8th Cir. 1988)).

### 1. Count One

"To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." United States v. Rolon-Ramos, 502 F.3d 750, 754 (8th Cir. 2007) (quoting United States v. Jiminez, 487 F.3d 1140, 1146 (8th Cir. 2007)). "An agreement to join a conspiracy need not be explicit but may be inferred from the facts and circumstances of the case." United States v. Slagg, 651 F.3d 832, 840 (8th Cir. 2011) (citations and internal quotation omitted). The government is not required to show a discrete, identifiable organizational structure. Id. (citing United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993); United States v. Baker, 855 F.2d 1353, 1357 (8th Cir. 1988)). Moreover, a "single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions." Id. (quoting United States v. Longs, 613 F.3d 1174, 1176 (8th Cir. 2010)).

The government presented more than sufficient evidence to prove Carrasco guilty of a drug trafficking conspiracy. As recounted above, Rios, Sr. testified that he trafficked in large amounts of illegal drugs with Carrasco. This testimony was corroborated by other members of the conspiracy, seized drugs, money orders, drug notes, phone records, and law enforcement surveillance observations. Thus, Carrasco's challenge to the sufficiency of the evidence on count one must fail. See, e.g., United States v. Faulkner, 636 F.3d 1009, 1021 (8th Cir. 2011) (holding that testimony of co-conspirators that was corroborated by investigation was sufficient to support conviction for conspiracy to distribute drugs).

Carrasco also challenges the sufficiency of the evidence to support the existence of a single conspiracy, arguing that the evidence showed that he was involved in "some undefined conspiracy" rather than the conspiracy alleged in the indictment. Whether the government's proof at trial established only a single conspiracy or multiple conspiracies is determined by the totality of the circumstances, drawing all reasonable inferences in favor of the verdict. Slagg, 651 F.3d at 841 (citing United States v. Radtke, 415 F.3d 826, 838 (8th Cir. 2005)). "Relevant factors include the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred." Id. at 841-42 (citations and internal quotations omitted).

The government's evidence established a single conspiracy. The evidence showed a group of individuals with the same core constituents (Carrasco, Ayala, and Rios, Sr.) working together to conduct the same activity (selling cocaine and methamphetamine) in the same location (Des Moines) during the same time frame (2008 to 2010). Carrasco, Ayala, and Rios, Sr. cooperated extensively to sell drugs, as Carrasco procured drugs from his sources, ordered Ayala to distribute them to others, including Rios, Sr., and collected money from Rios, Sr. after successful sales. Such "interdependence of the enterprise's participants provides ample support for a

reasonable jury's conclusion that they were working together to pursue a shared objective to sell large quantities of drugs." Id. at 840 (citing United States v. Roach, 164 F.3d 403, 412 (8th Cir. 1998) (internal quotations omitted)). Thus, each of the relevant factors supports a finding of perpetration of a single conspiracy, and the totality of the circumstances showed a single conspiracy as charged in the indictment. See id. at 841.

2. Count Ten

Count ten was based on the controlled substances seized from the stash house on June 5, 2009. Carrasco argues that there was insufficient evidence of his knowing possession of those drugs.

"The offense of possession with intent to distribute consists of two elements: knowing possession of [cocaine and methamphetamine] and the intent to distribute it." United States v. Finch, 630 F.3d 1057, 1060 (8th Cir. 2011) (quoting United States v. McClellon, 578 F.3d 846, 854 (8th Cir. 2009)). "Possession of contraband can be either actual or constructive." United States v. Cruz, 285 F.3d 692, 697 (8th Cir. 2002) (citing United States v. Moore, 212 F.3d 441, 445 (8th Cir. 2000)). "An individual has constructive possession of contraband if he has ownership, dominion or control over the contraband itself, or dominion over the premises in which the contraband is concealed." McClellon, 578 F.3d at 854 (citation and internal quotation omitted).

Taking the facts in the light most favorable to the verdict, a reasonable jury could have found Carrasco guilty of count ten beyond a reasonable doubt based on a theory of constructive possession. Carrasco was aware of the cocaine and methamphetamine shipments to the stash house in the spring of 2009, and he directed Ayala's sale of the drugs from the stash house. Carrasco directed Ayala to sell specific amounts of drugs to specific customers, and Ayala returned the proceeds

from these sales to Carrasco. By controlling the disposition of the cocaine and methamphetamine at the house, Carrasco exercised constructive possession over the drugs. See United States v. Parker, 587 F.3d 871, 881 (8th Cir. 2009) ("For constructive possession, a defendant must have knowledge of an object, the ability to control it, and the intent to do so.") (citation and internal quotation omitted). Carrasco claims that the applicable evidence must be ignored because "the Government witnesses completely lacked credibility." Carrasco Br. 38. Determinations of witness credibility, however, are "within the province of the jury and virtually unreviewable on appeal." United States v. Rush, 651 F.3d 871, 877 (8th Cir. 2011) (citation and internal quotations omitted). Given the extensive corroboration of the co-conspirators' testimony, sufficient evidence supported a guilty verdict on count ten.

B. Evidentiary Challenges

Carrasco appeals the district court's admission of various testimony and evidence. "We review a district court's evidentiary rulings for clear abuse of discretion, reversing only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." United States v. Faulkner, 636 F.3d at 1017 (citation and internal quotations omitted). "However, if a defendant fails to make a timely objection to testimony, we review the admission of the testimony for plain error." Id. To prevail under plain error review, a defendant must demonstrate an error that was plain, affected defendant's substantial rights, and seriously affected the fairness, integrity, or public reputation of judicial proceedings. Id. (citing United States v. Olano, 507 U.S. 725, 732 (1993)).

1. Evidence of Undercover Drug Buys

Carrasco argues that the district court erred in admitting evidence of controlled drug buys between Rios, Sr. and others and a confidential informant. He claims that

the testimony of agents describing the controlled drug buys was irrelevant, though he did not object to testimony by agents describing the controlled buys. Instead, he objected only to the admission of the purchased drugs themselves. As a result, Carrasco must show that the admission of the testimony describing the sales amounted to plain error. See Faulkner, 636 F.3d at 1017. To the extent that he preserved objection to the admission of the actual drugs sold, he still must show that the district court clearly abused its discretion.

Carrasco cannot establish that the district court abused its discretion by admitting the drugs sold during the controlled buys, much less meet the plain error standard of review for the testimony about the controlled drug buys. We have held that evidence of controlled drug buys from co-conspirators may be admissible even when the buys did not involve the particular drug conspiracy defendant. See United States v. Johnston, 353 F.3d 617, 624 (8th Cir. 2003) (per curiam) (affirming district court's admission of evidence of controlled drug buys from co-conspirators, even though such buys did not involve defendant, because such evidence was relevant). "In a conspiracy case, each member of a conspiracy may be held criminally liable for any substantive crime committed by a co-conspirator in the course and furtherance of the conspiracy, even though those members did not participate in or agree to the specific criminal act." Id. (citing United States v. Escobar, 50 F.3d 1414, 1420 (8th Cir. 1995) (internal quotation omitted)). Evidence of "reasonably foreseeable buys that occurred on behalf of the conspiracy" are relevant and admissible to "illustrate[] the extent of the conspiracy's operation." Id. (citing Escobar, 50 F.3d at 1420).

Here, the evidence of the controlled buys from Rios, Sr. illustrated the extent of the conspiracy's operation. See id. Evidence demonstrated that Carrasco was Rios, Sr.'s primary source at the time of the sales, and Rios, Sr.'s drug dealing was reasonably foreseeable to Carrasco, considering his acceptance of the proceeds. The controlled buys evidence also corroborated information provided to law enforcement about Rios, Sr. In addition, the evidence was relevant to determination of the guilt

of Carrasco's co-defendant, Pablo Fernandez Rodriguez, who was seen by law enforcement during the controlled buys and remained a co-defendant at the time the evidence was admitted.[4]  Under the circumstances, the district court did not abuse its discretion in admitting evidence of the controlled drug buys.

2.  Evidence of Carrasco's Firearms Possession

Carrasco contends that the district court abused its discretion by admitting evidence of three firearms and one ammunition receptacle seized from his home. Carrasco argues that such evidence was inadmissible under Rules 401, 402, and 403 of the Federal Rules of Evidence because he possessed the guns legally and no evidence connected the firearms to any illegal drug activity.

The district court did not abuse its discretion by admitting the firearms and ammunition evidence.  Although no drugs were found at Carrasco's home, valuables including expensive clothing and vehicles were found there.  Evidence also established that drug dealers often use guns not only to protect themselves and their drugs, but also to protect their assets and property.  Thus, Carrasco's possession of multiple guns and ammunition constituted admissible "tools of the trade" evidence. See United States v. Caballero, 420 F.3d 819, 821 (8th Cir. 2005) ("Evidence of firearms possession is admissible and relevant as 'tools in the drug trade' in circumstantially proving involvement in drug trafficking.") (quoting United States v. Dierling, 131 F.3d 722, 732 (8th Cir. 1997)).  Moreover, any risk that the jury might have unfairly assumed that Carrasco illegally possessed the guns was adequately mitigated by the district court's cautionary instruction that "there [were] no charges against the defendant involving anything related to firearms."  Tr. 368; see United States v. Kent, 531 F.3d 642, 651 (8th Cir. 2008) (noting that "this Court has been

---

[4]Rodriguez pleaded guilty later in the trial.

reluctant to find that the evidence was unfairly prejudicial when the district court gave an appropriate limiting instruction") (citation and internal quotation omitted).

### 3. Allegedly False Testimony

Carrasco contends that the district court should have *sua sponte* granted a mistrial following allegedly false testimony from Special Agent Ben Post, who testified that three guns were found in Carrasco's bedroom closet. On cross-examination, however, Post admitted that he did not personally search Carrasco's bedroom, and when shown photographs at trial taken at the time of the search, he acknowledged that the photographs appeared to show that two of the guns were found in a safe elsewhere in the house. Carrasco did not object to the testimony at issue or seek a mistrial, but he argues that the district court was obliged to *sua sponte* declare a mistrial based on Post's testimony. Although a district court's ruling on a motion for mistrial ordinarily is reviewed for abuse of discretion, see United States v. Garrett, 648 F.3d 618, 624 (8th Cir. 2011), we have assumed without deciding that plain error review is appropriate when a defendant failed to request a mistrial. See United States v. Meeks, 639 F.3d 522, 526 (8th Cir. 2011) ("We have assumed, without deciding, that plain error review is appropriate in the situation where the defendant fails to move for mistrial.") (citing United States v. Green, 560 F.3d 853, 859 (8th Cir. 2009)).

"To prove prosecutorial use of false testimony, a defendant must show that: (1) the prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict." United States v. Funchess, 422 F.3d 698, 701 (8th Cir. 2005) (citing United States v. Peterson, 223 F.3d 756, 763 (8th Cir. 2000)). "Perjury entails not only false testimony, but an additional element of intent . . . ." United States v. Collier, 527 F.3d 695, 702 (8th Cir. 2008) (citing United States v. Ziesman, 409 F.3d 941, 956 (8th Cir. 2005)). To show that

Post committed perjury, Carrasco must show that Post provided "'false testimony concerning a matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" Id. (quoting Ziesman, 409 F.3d at 956).

Carrasco cannot satisfy the foregoing requirements. Post's testimony was based on his understanding of the search warrant reports, and while he may have been mistaken, nothing in the record supports a finding that he provided willfully false testimony. In addition, Carrasco cannot show that he was prejudiced by the mistake, as he successfully challenged the error on cross-examination, and the location of the firearms constituted relatively minor evidence in this case. See United States v. Constantine, 674 F.3d 985, 989 (8th Cir. 2012) (noting that "[a] district court may avoid substantial prejudice . . . by allowing the defendant 'ample opportunity for cross-examination'" and impeachment of a witness) (citing United States v. Barnes, 486 F.2d 776 (8th Cir. 1973)). Thus, whether an abuse of discretion or plain error standard of review applies, Carrasco's claim must fail.

### 4. Carrasco's Hearsay Objections

Carrasco appeals the district court's overruling of three hearsay objections to testimony by Special Agent Bearden. The objections concern Bearden's testimony about (1) authorship of writings in a notebook found at the stash house, (2) Ayala's interviews with law enforcement, and (3) Carrasco's ATV purchase.

### a. Drug Note Authorship

Carrasco argues that the district court erred by not sustaining Carrasco's hearsay objection to Bearden's testimony attributing certain handwriting to Carrasco. The testimony at issue followed Bearden's testimony describing the contents of a notebook containing various drug notes found by other agents. Bearden testified:

-14-

> Also in this same exhibit, the notebook paper that has Chava listed on it with some numerals after it and some other names or initials, Toledo Ayala actually attributed this piece of paper or this handwriting to Vi[n]cente Carrasco Espinoza –

Tr. 461. In response to Carrasco's hearsay objection, the district court responded, "[a]t this point in his testimony, it's overruled." Tr. 461. In a written order denying Carrasco's motion for a new trial, the district court explained further, "[t]he brief reference at that point in the testimony did not seem to provide an adequate basis for the conclusion that the testimony was offered to prove the truth of the statement." Dist. Ct. Order of Aug. 8, 2011, at 7. The government did not question Bearden further regarding the exhibit at issue and the government did not rely on Bearden's testimony regarding the exhibit during closing arguments.[5]

We agree with the district court that it was not clear from Bearden's reference that the statement was offered for the truth of the matter asserted, rather than as a background explanation for why agents turned their investigation toward Carrasco following the stash house search. See United States v. Orr, 636 F.3d 944, 957 (8th Cir. 2011) (noting that "an out-of-court statement is not offered for the truth of the matter asserted, and is thus not hearsay, when it is offered merely to show why police began surveilling an area or following a criminal suspect") (citing United States v. Parish, 606 F.3d 480, 487-88 (8th Cir. 2010)). Moreover, Bearden's statement was cumulative of and corroborated by other evidence, including the cross-examination

---

[5]Carrasco contends that the government sought to exploit the alleged hearsay during its cross-examination of Carrasco as well as during its closing argument. Our review of the record, however, reveals that neither the cross-examination nor the government's closing argument contained any reference to the challenged portion of Bearden's testimony or otherwise referenced Ayala's belief that the drug note was written by Carrasco. Rather, the questioning and argument focused on the exhibits themselves and highlighted the similarities between the handwriting on the drug note and on Carrasco's other writings.

of Carrasco, during which Carrasco was confronted with the similarities between the handwriting on the drug notes and on his employment application. Given this independent evidence, Carrasco cannot show that Bearden's testimony about the drug note had "more than a slight influence on the verdict." United States v. Robinson, 639 F.3d 489, 492-93 (8th Cir. 2011) (citation and internal quotation omitted); see also United States v. Melecio-Rodriguez, 231 F.3d 1091, 1094 (8th Cir. 2000) (noting that "[a]n error in admitting testimony may be harmless if the testimony is corroborated by independent sources, or if it amounts to cumulative evidence on matters already before the jury") (citations omitted). Thus, even if Bearden's testimony had concerned an out-of-court statement offered to prove the truth of the matter asserted, and thus was hearsay, any error in admitting the statement would have been harmless.

### b. Ayala's Interviews with Law Enforcement

Carrasco next challenges that portion of Bearden's testimony in which he identified discrepancies between Ayala's statements to investigators in Ohio and Ayala's statements to Bearden in Iowa. The discrepancies concerned the date and size of a particular drug shipment to Des Moines.

Because Bearden's comparison of Ayala's Ohio and Iowa interviews was not offered to show the truth of the matters asserted, it did not constitute hearsay under Rule 801(c) of the Federal Rules of Evidence. Fed. R. Evid. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."); see also United States v. Yarrington, 634 F.3d 440, 448 (8th Cir. 2011) (noting that "when a party offers an out-of-court statement made by a government witness in order to impeach that witness by showing that he had made statements contrary to his trial testimony – and not to establish the truth of his out-of-court statement – the out-of-court statement is not hearsay") (citation omitted). To the extent that Bearden's testimony bolstered Ayala's trial testimony by showing that

the discrepancies between Ayala's prior statements were minor and that his statements remained largely unchanged, Bearden's testimony was admissible. See Fed. R. Evid. 801(d)(1)(B) (permitting the use of a prior statement when (1) the declarant testifies and is subject to cross-examination abut the prior statement, and (2) the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying").

c. Carrasco's ATV Purchase

Carrasco's final hearsay claim challenges the admission of Bearden's testimony concerning Carrasco's purchase of an $8,000 ATV. The government asked Bearden, "through your investigation do you know how much cash was paid down on [the ATV]?" Tr. 464. After Carrasco's hearsay objection was overruled, Bearden answered, "[d]ocumentation has been obtained showing that [Carrasco] put several thousand dollars down as a down payment when he initially purchased it and then put the balance on some type of payment plan or card." Tr. 464-65. No additional evidence was presented regarding the source or method of payment for the ATV. The jury subsequently returned a verdict finding that the ATV constituted or was derived from proceeds that Carrasco had obtained as a result of crimes for which he was convicted.

The ATV purchase was only one of several examples of financial extravagance difficult to explain by Carrasco's legitimate income, including Carrasco's home, SUV, and large numbers of new, expensive clothing items. In light of this evidence, any error in admitting the testimony regarding Carrasco's ATV purchase was harmless. See Robinson, 639 F.3d at 492-93 (noting that "'[t]he admission of hearsay evidence that is cumulative of earlier trial testimony by the declarant or cumulative of other hearsay evidence to which no objection was made is not likely to influence

the jury and is therefore harmless error'") (quoting United States v. Londondio, 420 F.3d 777, 789 (8th Cir. 2005)).

C.  Alleged Prosecutorial Misconduct During Closing Arguments

Carrasco contends that the government engaged in misconduct during closing arguments.  "A trial court is vested with 'broad discretion in controlling closing arguments and we will reverse only on a showing of abuse of discretion.'" United States v. Coutentos, 651 F.3d 809, 821 (8th Cir. 2011) (quoting United States v. Miller, 621 F.3d 723, 729 (8th Cir. 2010)).  "To obtain a reversal based on prosecutorial misconduct to which there was proper objection, a defendant must show that (1) the prosecutor's remarks or conduct were improper, and (2) the remarks or conduct affected the defendant's substantial rights so as to deprive him of a fair trial." Id. (quoting United States v. Montgomery, 635 F.3d 1074, 1096-97 (8th Cir. 2011)).

The statement at issue concerned the testimony about Carrasco's relationship with Ramos.  During closing arguments, the government made the following comment regarding the Ramos transaction:  "Rios, Sr., testified that Carrasco gave him Ramos as a meth customer and he delivered two ounces of meth and one ounce of meth, two occasions, to him and, again, that's high on the call frequency report." Tr. 600.  Carrasco argues that this statement constituted prosecutorial misconduct because "there was absolutely no testimony that the individual in the call frequency report was the same individual Rios, Sr. was referring to."

The district court did not abuse its discretion in overruling Carrasco's objection to the challenged testimony.  "'Prosecutors are entitled to argue reasonable inferences to be drawn from the facts in evidence during closing arguments.'" United States v. Frokjer, 415 F.3d 865, 874 (8th Cir. 2005) (quoting United States v. Schumacher, 238 F.3d 978, 981 (8th Cir. 2001)).  This is precisely what the prosecutor did in this case. It was not unreasonable to suggest a connection between the call frequency report

-18-

showing multiple calls with "A. Ramos" and Rios, Sr.'s testimony about a customer with the same last name. The reasonableness of this inference was bolstered by Carrasco's implausible testimony that he did not know any "A. Ramos," despite having contacted him twenty-six times during the conspiracy. See id. (noting that prosecutor is entitled to argue reasonable "inference that the defendant is not credible"). In light of these circumstances, the prosecutor's remarks neither were improper nor deprived Carrasco of a fair trial.

D.  Jury Instructions

Carrasco raises several challenges to the district court's jury instructions. A "'district court has wide discretion in formulating appropriate jury instructions.'" United States v. Poitra, 648 F.3d 884, 887 (8th Cir. 2011) (quoting United States v. Cruz-Zuniga, 571 F.3d 721, 725 (8th Cir. 2009)). "We will affirm the use of particular jury instructions 'if they fairly and adequately submitted the issues to the jury.'" Id. (quoting United States v. Farish, 535 F.3d 815, 821 (8th Cir. 2008)). Although a defendant is "entitled to a specific jury instruction that conveys the substance of his request" if the request is timely, supported by the evidence, and a correct statement of law, a defendant "is not entitled to a particularly-worded instruction when the instructions actually given by the trial court adequately and correctly cover the substance of the requested instruction." Cruz-Zuniga, 571 F.3d at 725 (citing United States v. Whitehead, 176 F.3d 1030, 1037 (8th Cir. 1999); United States v. Long, 977 F.2d 1264, 1272 (8th Cir. 1992) (internal quotations omitted)). "We review the district court's denial of a proposed jury instruction for abuse of discretion, reversing 'only if the district court's alleged erroneous failure to give a particular instruction was prejudicial.'" Id. (quoting Whitehead, 176 F.3d at 1037)).

1. Constructive Possession

First, Carrasco claims that the district court's instruction defining constructive possession was inadequate, allowing the jury "to assess constructive possession as if the contraband had been found in Carrasco's residence, when it was undisputed that no narcotics were seized from his home." We disagree. The possession instruction given by the district court followed the Model Criminal Jury Instructions for our circuit and fairly and adequately submitted the issue of possession to the jury. See Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, 8.02 (2011) (citing United States v. Smith, 104 F.3d 145, 148 n.2 (8th Cir. 1997); United States v. Ali, 63 F.3d 710 (8th Cir. 1995); United States v. Johnson, 857 F.2d 500, 501-02 n.2 (8th Cir. 1988); United States v. Montgomery, 819 F.2d 847, 851 (8th Cir. 1997); Sewell v. United States, 406 F.2d 1289, 1293 n.3 (8th Cir. 1969); United States v. Henneberry, 719 F.2d 941, 945 (8th Cir. 1983) (including definition of constructive possession)). Because the instruction given adequately and correctly incorporated the substance of Carrasco's requested instruction, the district court did not abuse its discretion in denying it.

2. Drug Quantities

Next, Carrasco contends that the district court abused its discretion by submitting a verdict form that allowed the jury to calculate drug quantities based on "a mixture or substance," when the superseding indictment contained no such express language. The superseding indictment and the jury instructions, however, followed the plain language of the statute, and thus the verdict form did not constructively amend the indictment. See United States v. Kuenstler, 325 F.3d 1015, 1022 (8th Cir. 2003) (holding that jury instructions reading "50 grams or more of a mixture and substance of methamphetamine" did not constructively amend indictment reading "50 grams or more of methamphetamine"); see also United States v. Yielding, 657 F.3d 688, 709 (8th Cir. 2011) (noting that a "jury instruction constructively amends the

-20-

indictment if it alters the essential elements of the offense charged in the indictment and thereby creates a substantial likelihood that the defendant was convicted of an uncharged offense") (internal quotation omitted).

### 3. Aiding and Abetting

Carrasco also objected to Instruction 20, which informed the jury that a person may be found guilty of possession with intent to distribute illegal drugs if he aided or abetted the commission of such crime. Carrasco argues that the district court abused its discretion by formulating such an instruction without expressly requiring the jury to agree unanimously on which individual Carrasco aided and abetted. Carrasco offers no authority in support of this argument. Instruction 20 closely tracks the applicable Model Criminal Jury Instruction for our circuit and fairly and adequately submitted the aiding and abetting issue to the jury. Accordingly, the district court did not abuse its discretion in giving Instruction 20. See Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, 5.01 (2011); United States v. Santana, 524 F.3d 851, 853 (8th Cir. 2008) (stating elements of aiding and abetting).

### 4. Multiple Conspiracies

Carrasco appeals the district court's denial of his requests for two instructions regarding multiple conspiracies. These instructions, however, were not supported by the evidence, which established a single conspiracy composed of the same core participants in the Des Moines area during the charged time frame. The district court thus did not abuse its discretion in refusing to give them. See Faulkner, 636 F.3d at 1020-21 (holding that multiple conspiracy instruction was not required when unsupported by the evidence).

5. Identity of Co-conspirators

Carrasco contends that the district court abused its discretion by failing to include the names of Carrasco's co-conspirators in the conspiracy instruction. The district court's Instruction 10 required the jury to find that Carrasco conspired "with other persons" in order to convict, rather than naming all the co-conspirators. As both the superseding indictment and Instruction 10 denoted "other persons," no constructive amendment occurred. See United States v. Spencer, 592 F.3d 866, 873-74 (8th Cir. 2010) (concluding that no constructive amendment occurred when conspiracy instruction did not list specific co-conspirators as charged in the indictment when the indictment also stated that defendant conspired "with others").

6. Conspiracy "Agreement" Instruction

Carrasco appeals the district court's denial of his proposed instructions advising the jury that mere association with others, or mere presence at the location of a crime, is insufficient to establish a conspiracy. Carrasco's proposed instructions on this subject, however, were duplicative of Instruction 13, which adequately and correctly covered the substance of Carrasco's requested instructions. See Cruz-Zuniga, 571 F.3d at 725. Instruction 13 closely followed Eighth Circuit Model Criminal Jury Instruction 5.06B. The district court did not abuse its discretion in giving Instruction 13 and denying Carrasco's duplicative proposed instructions.

7. Informant

Finally, Carrasco argues that the district court should have given his proffered instruction advising that as a matter of law a conspiracy cannot be established between a defendant and law enforcement. The record does not support such an instruction, as there was no suggestion by the government that an informant was Carrasco's co-conspirator. Because no evidence supported Carrasco's proffered

instruction, the district court did not abuse its discretion by refusing to give it. See Faulkner, 636 F.3d at 1020-21.

## III.

The judgment is affirmed.

_____